May it please the Court, representing Mr. Ivers. Ivers' attorney was not prepared or qualified to represent him at the revocation hearing. The attorney admitted in open court on the record that he had told his client that he was as dumb as a doorbell or a doorknob. The district court forced Ivers to choose between proceeding with this attorney, who admitted on the record that he was dumb as a doorbell or a doorknob, or representing himself. And in that context, this was a Hobson's choice that violated his statutory right to counsel. We are urging this Court to vacate the revocation sentence and remand. Now, the standard for assessing whether someone should be granted substitute counsel is that the defendant bears the burden to show justifiable dissatisfaction with their attorney. And I think the record amply demonstrates that here. Not only was there an admission in open court by the attorney that he had told Ivers that he was dumb as a doorbell or a doorknob, Ivers also said that he told him that he slid through law school, that he had no idea what he was charged with. And then a little later in the resulting colloquy, when he asked for an opportunity to confer with his attorney, Mr. Sager, Mr. Ivers said, do you see how he talks? He says, I have to choose between the big house or the nut house. There was absolutely no motion, has never been any attempt by the government to involuntarily commit Ivers. So he was not facing the nut house as a possible sanction. And I think that all of that evidence distinguishes this case from Owens, which is where this Court previously addressed the issue of a defendant facing a revocation hearing wanting substitute counsel. In that case, there was massive evidence that the defendant was simply engaging in delay tactics. By the time he actually had the hearing, it was the fourth revocation hearing, there were a variety of excuses offered to delay it previously. Medical, I'm not getting my medicine, I'm getting my medicine, but it's not the right dose. And there, there was a finding made by the Court on the record that the defendant there was engaging in a pattern or practice of attempting to delay his hearing. And so his expression of dissatisfaction with his counsel was merely another arrow in his quiver of attempting to achieve that aim, of attempting to delay the hearing. And Owens said there was no record, no record evidence supporting that his attorney was unprepared or unqualified. And on that basis, it denied his appellate argument. But here, there's not evidence of delay by Ivers, right? I mean, he had two previous revocations. He didn't try to delay those. He, in fact, the first words out of his mouth once he was confronted with this issue is he said, I want to represent myself and I want to know why my prior attorney, Manny Atwell, is not here. I didn't consent for her to withdraw. She knows my case inside and out. I want her to represent me. So there's no evidence of delay tactics, and there's abundant evidence that his counsel was unqualified and unprepared to represent him. Now, while there was only the admission by counsel that he made the dumb as a doorbell or a doorknob comment, in the context of making that comment, when Ivers then proceeded to say that he told him that he slid through law school, that he had no idea what he was charged with, and then later, after conferring with him, that he told him he had to choose between the big house or the nut house, the fact that his attorney did not say, I didn't say those things, that's not true, I think lends high credence to the fact that that is what happened. I mean, this transcript is, frankly, astonishing. I have never read — Well, there's some things about it that are astonishing. Most astonishing to me is that nobody bothered to follow up and ask what really happened here, right? I mean, because the deal is, there are a lot of self-deprecating lawyers. I don't know how many lawyers I've seen that are absolutely fantastic and who have admitted to people, you know, irresponsible pushback on an obviously crazy position by their client and says, yeah, I'm as dumb as a doorknob, I'm not following you, I don't get this, and maybe I just barely got through law school, but, man, you don't really have any there there on that, right? And that's a very different comment than, you know, taken as all literally true. It is, I'm as dumb as a post, I can't get this done, and I don't even know what you're doing here, you know, and that would be — I have all the hallmarks you've just described, but we don't know, really, if that's what happened here because nobody ever bothered to follow up. I mean, you know what I mean? It's like — and the guys that are self-deprecating, I mean, you practice here in the Midwest, you know these people. They're not going to stand up and just start pounding the table and saying, hey, judge, you know, particularly — there are probably people the judge has some familiarity with already, you know? So I guess I don't have a question. I'm just saying I'm just mostly shocked that nobody followed through on this. So I have a couple of responses. One, I'd like to address the self-deprecating. But first, I agree with you that there wasn't an inquiry made by the district court into what was going on with his counsel and why he was dissatisfied with his counsel. The And he interjected and interrupted Ivers several times when he had said, well, yeah, if my choice is between me and this guy, I want me. But he said several times in the transcript, he said, I would like Manver Atwell to represent me. That's on page five of the transcript. He said, I wouldn't mind having a qualified attorney sit next to me. That's on page six of the transcript. I mean, it's littered with references to requesting an attorney. He did also say he wanted to represent himself. That was in the context of the choice between himself and this person. Now, going to the comment about self-deprecating, the government was able to dredge up two cases about self-deprecating saying, oh, these are just self-deprecating comments. These aren't enough. They're both unpublished. They're both district court cases. They're not even in district court cases that are from this circuit. And look at those two cases. In Murray v. Sherman, one of the cases the government cites, the basis for the self-deprecating discussion in the district court was the attorney had asked a question. The district court said, I find that question really confusing. And then the attorney said something like, I was trying to simplify it, but I made it worse. That is way different than the comment here at issue. And in the other case, Kearns v. Hoskey, we don't even know what the attorney said. It was a one-paragraph discussion consisting of two sentences that was one of a number of reasons of rejecting the overall claim, which I believe was a claim of ineffective assistance of counsel. There was procedural bar issues, procedural default issues, if I'm recalling that case correctly. So the government hasn't shown anything like the comments made in this case. And the authority on that point, I would submit, is not persuasive for all of those reasons. And I think the fact that the district court did not inquire is another deficiency. I mean, if you look at Owens, if you look at — I'll get the site with me. I have it on my desk. But there are two other cases, Jones and Taylor, where this Court has addressed issues of either wanting new counsel or substitute counsel. The Eighth Circuit has talked about when you have a claim of dissatisfaction with an attorney, you should inquire and find the basis for the claim. I think here the basis was clear. The basis is manifest. The other thing I'd like to say is one of the other government's primary points is, well, you can't show prejudice, and therefore you lose. Now, first of all, Owen didn't discuss prejudice. You won't find a word about prejudice in that opinion, right? You also won't find a word about prejudice in Jones and Taylor. The government's case, Brown, is an unpublished case that itself cites to an immigration case that says that you have to show prejudice in the context of a due process claim brought by an alien. So I'm not even convinced that prejudice would need to be shown here. They can't — they have no authority that squarely says that. But I also think that prejudice is established here. He had a substantial defense to one of the alleged violations. He had an official document from the BOP saying that he could go to his sister's address, which is where he went, which was the basis for one of the Was that document in the record? It is in the record. I believe it is on page 148 of the appendix that I submitted. I can get the page number and provide that for sure. But it is in the record. It's in my appendix. Thanks. And I understand the dispute was that that document was wrong and he knew it was wrong. Sure. There was evidence that there were other documents that said, no, you've got to go to the halfway house. I'm not saying that he had an airtight defense. I understand. There was a dispute about whether — he had a document that he said he relied upon, but they had other documents that said he didn't have relied upon this mistake. Yeah. Well, I think they were issued at different times, so it was a question of which one controlled. But the point I'm trying to make is, you know, when you read that hearing, it's frankly a train wreck when you watch Ivers trying to establish his points. Numerous objections are sustained. He's struggling to get exhibits in. He's trying to admit transcripts that are already into evidence. He's not doing a good job. He's — but he was faced with that, or an attorney who said, I'm stupid, I don't know anything about your case, I barely skated through law school, and you're going to have to decide whether you want to go to the big house or the nut house, when there was absolutely no basis to send Mr. Ivers to the nut house. On this record, we urge that it was an abuse of discretion for the Court to just immediately shunt him into representing himself and not consider appointing qualified prepared counsel, which he manifestly did not have.  Mr. Gingrich. May it please the Court. Good morning. David Gingrich on behalf of the government. I'd like to discuss the context in which the comments highlighted by defense counsel were made with respect to both the law and the transcript, and hopefully be responsive to the concerns raised by the Court during my colleague's argument. So I think the context matters for two reasons, at least. The first is the standard of review, of course, is abuse of discretion. And there's considerable discretion, I think, as this Court has phrased it, with respect to Judge Pratt's decision to allow him to represent himself. And when assessing comments made, particularly self-deprecating or even sarcastic comments made by counsel in front of Judge Pratt, he and he alone really was in the best position to assess their seriousness and what, if any, impact they would have on the quality of representation received by Mr. Ivers. So the government does believe the standard of review is important here because the context and the district court's ability to assess the context is critical to review of the district court's decision. Second, I think context matters because these comments highlighted by defense counsel were not made in isolation. And I'd just kind of like to draw some through lines through the transcript here that I think explains how Judge Pratt did, in fact, follow up. Could more questions have been asked? Certainly. Could more questions always be asked? Certainly. On this record, would it have been preferable, perhaps, to ask more questions? Maybe. But I think if the Court follows the through line through the transcript, it really would see three things. First of all, counsel suggested that Judge Pratt jumped right to the notion that Mr. Ivers would represent himself. In fact, it was Mr. Ivers who unsolicited, unprompted, and spontaneously said, I want to represent myself. I think that's on the top of page four of the transcript. He hadn't been asked a question. He hadn't been addressed by the Court. So in context, the way in which this hearing starts and the way in which the subsequent defendants, sua sponte, unprovoked, exclamation, and statement that he wants to represent himself. But he also followed it up with the statement, this gentleman has acknowledged he doesn't know anything about the case. And that's the second important piece of context, Your Honor, because before he says that, he says, essentially, I want Manny Atwell. And I think in context what this transcript reflects is that he wanted to represent himself, but what he really wanted was his choice of counsel. He wanted Manny Atwell to represent him. And the reason he wanted Manny Atwell to represent him is that Manny had represented, Ms. Atwell had represented him in connection with the two prior supervised release hearings, and he was clearly satisfied with her representation. And by virtue of her prior representation, she knew his case. Now it's clear, of course, in this Court's law that a defendant does not have the right to choose his own counsel. It's also clear that later in the transcript, Judge Pratt explains to Mr. Ivers, when he raises for a second time the request to have Ms. Atwell represent him, that the magistrate determined she was otherwise occupied and that she wasn't available for this matter, which, of course, is not unusual for a third supervised release matter in a case that has spanned a number of years, particularly when you're receiving appointed counsel. So I want counsel. What I really want is Manny Atwell. She hasn't politely explained why she's withdrawn. I haven't given permission to withdraw. Can you tell me where I stand with respect to Ms. Atwell? Well, he's not — she doesn't need his permission. It's the magistrate that represents or appoints counsel, and he's not entitled to counsel of his choosing. So, Your Honor, when he says, this guy doesn't know my case, it's immediately after comparing Mr. Sager to Ms. Atwell. And while it may be true that Mr. Sager did not have — certainly did not have the prior experience with the case that Ms. Atwell did, that's not the standard here. That doesn't satisfy defendant's burden to say, I'd like Ms. Atwell. She knows this case in a way that my — this guy doesn't. Yeah. Just to follow up on kind of what Judge Erickson had to say, I'm looking at this and I'm saying to myself, why didn't somebody jump in here? You know, if it wasn't Judge Pratt, why didn't the AUSA? Because you know you were going to be up here probably on an appeal with this kind of a record. Or why didn't the defense counsel? Why didn't somebody jump in and say, no, I didn't say — I didn't say I didn't know anything about his case? Or why didn't the government say, let's make a better record here so you're not standing up here trying to parse words about whether or not this is an adequate record? And I wasn't just — I wasn't counsel, just to be clear, so you don't think I'm incorporating my personal views of what happened. But I think, Your Honor, on this record, Judge Pratt did an adequate job of exploring the desires of Mr. Ivers. Mr. Ivers said, I want to represent myself. Then he said, what about Ms. Atwell? Nope. Then you'll see on page 4 that the court and Mr. Ivers essentially start interrupting each other, and that's where these dashed conversations occur. And the last — the last statement Mr. Ivers makes is, I want to represent myself, either that or I, dash, dash. If you turn the page, the following page in the transcript, the court says, okay, I understand that you've asked to represent yourself, and begins the Feretta process. Defendant interrupts and says, I want Ms. Atwell to represent me. I have not given her permission to withdraw. And Mr. — and Judge Pratt again goes over the fact that she's otherwise occupied, and she's not available to represent him. So yes, there could have been a step back by the district court or intervention by the AOSA to take a step back and start from square one. Certainly, we can see that's one way this could have gone, and it may have made for a clearer record. But I think if you, again, follow the through line through the transcript, I want to represent myself. So that's the immediate posture. He's expressing that he wants to exercise his right to self-representation. I want Ms. Atwell. Well, I'm sorry, sir, but that's not going to be possible. Okay, well, I want to represent myself, either I or interruption. I want Ms. Atwell. I haven't given her permission to withdraw. That's not possible. Then Judge Pratt says again, after that, he says, essentially, my understanding is you want to represent yourself. Is that right? Yes. So there could have been more fulsome exploration, and, Your Honors, I think there may have been if Mr. Ivers had started from a position of my attorney is not qualified, I want a different attorney. That might provoke a whole series of preliminary questions that differ from starting from a posture of I want to represent myself. Why isn't Ms. Atwell here? And I think right in that context, Judge Pratt's follow-up, as Judge Erickson put it, was at least appropriate. He tried to assure Mr. Ivers as to why Ms. Atwell wasn't there, and tried and did give Mr. Ivers a full and complete set of records that would — that might — he might encounter. If I could, Your Honor, pivoting from the transcript, unless the Court had more questions, just to discuss Owen for a moment, and then prejudice. With respect to Owen, I'd like to make two points. First of all, there's no question in Owen that the record demonstrated that the defendant was dissatisfied with his counsel. He said he had filed a bar complaint. The defendant said he had filed a civil lawsuit. He said his attorney was unprepared, and he said they had disagreements about legal strategy. So the record in that case is replete with examples of dissatisfaction. But what this Court held, and this is the second point, is that when the district court said, well, that doesn't satisfy your burden, and you have two — three choices, he said, pro se representation, your current counsel could continue, or pro se representation with assistance of counsel as standby. And that's exactly the — the events here. Defendant expressed dissatisfaction after saying, I want to represent myself. The Court explored that with him, determined that he wasn't going to get substitute counsel, and then gave him the remaining choices. And if you read the Owen case, that's exactly what this Court affirmed in Owen. Of course, Owen has different facts, but the principles apply equally here. Owen was not a prejudice case, so this Court had no occasion to discuss the prejudice standard. But the Brown decision, while unpublished, makes perfect sense in this context. There is no constitutional Sixth Amendment right, so we're not talking about structural error. But even in the context of constitutional error, it's rare that you find — that this Court applies structural error. Harmless error is the default. And here we're talking about a statutory right backed by a due process analysis. And due process on the constitutional standard, harmless error applies. Respectfully, with respect to my colleague's argument about prejudice, all of the evidence cited by the — by the — by my colleague, including Exhibit 5 to the detention hearing, which is what he referenced being in the appendix, was before Judge Pratt. There were three violations alleged. As I believe the defense concedes in their brief, there was, by a preponderance of the evidence, enough to support all three, but certainly enough to revoke the defendant's supervision. And all of the arguments made in sentencing mitigation on appeal were also presented below. I'd respectfully suggest that given Judge Pratt's efforts to have a colloquy with the defendant and his deep knowledge of this case and the parties involved, that the Court affirm the judgment below. Thank you. Thank you. Mr. Myers, I believe you used all your time, but I will give you one minute for rebuttal if you wish. That would be based on the vast and near-dictatorial powers I have, so I have no objection. I appreciate the latitude, Your Honor. Okay. Two points, maybe three. First, my opposing counsel said, hey, look, under the full context, you know, the district court got to see him, maybe the attorney was just being sarcastic, things like that. I think the full context rebutts that. We have not just the, I'm as dumb as a doorbell or a doorknob, I slid through law school, I don't know what you're charged with, and you have to decide between the big house or the nuthouse. That's not a sarcastic comment. There was no attempt to put him in the nuthouse. That's an attorney that does not know what's going on and has amply demonstrated it in the record. There's no way to read that as a joke. And, in fact, Ivers even referenced when he says I'm going to represent myself, he says, I think I'm making the right decision. He refers to going to the nuthouse. I'm not in any kind of trouble that has to do with the nuthouse. Second, opposing counsel said, well, he really just wanted Manny Atwell. Sure, he brought up Manny Atwell, but he said he'd also like an attorney that would help get him out of jail. That's not Manny Atwell specific. He also said he wouldn't mind having a qualified attorney sitting next to him. I think it is true that he was satisfied. I see my time is up. May I just briefly conclude? You may. I think it is true that he was satisfied with Manny Atwell's performance, but I don't think that this can just be simply cabined into the I want a specific attorney. There are general comments of I want an attorney that's going to help get me out of jail. I'm facing serious consequences here, and this attorney had demonstrated that that was not true of him. Thank you. Thank you. The matter is submitted, and we have taken it under advisement. I want to thank you all for your briefing and your arguments here today. They were most helpful to the Court. We will stand in recess on – well, there's nothing else on the calendar today. Is that true? Your Honor. Yeah. Okay. We'll stand in recess until 9 a.m. tomorrow morning. Thank you.